No. 2483.

R. A. Williams *v.* The State.

1. Manslaughter—Penalty—Charge of the Court.—*Two* years in the penitentiary is the minimum term provided by law as the penalty for manslaughter. Charge of the court, therefore, which instructs the jury that *three* years is the minimum constitutes fundamental error.

2. Same—Murder.—Conviction for a lower grade of homicide than murder eliminates the law of murder from the case, and relieves this court of the duty of considering the sufficiency of the charge of the trial court upon murder.

3. Same—Intoxication—Interpretation of the Codes—Charge of the Court.—Intoxication, or temporary insanity produced by the voluntary, recent use of ardent spirits, will not excuse crime, nor necessarily mitigate the penalty prescribed by law for the crime. · But such state of mind may be proved, and, when proved, may be considered by the jury in mitigation of the maximum prescribed penalty. In a case where the crime charged is murder, such state of mind may be considered by the jury in determining the degree of the offense, and also in mitigation of the penalty of any degree of culpable homicide of which the defendant may be found guilty. A charge upon this subject, conforming substantially to the language of the statute is, ordinarily, sufficient. Note also that the charge in this case was not excepted to, nor sought to be corrected by a special charge; wherefore, in view of the evidence, it would not in any event, if erroneous, constitute material error—no prejudice to appellant being manifest.

4. Impeaching Testimony—Charge of the Court.—A witness introduced by the State having testified to facts tending to support the defense, the State over the objection of the defendant, introduced evidence to impeach its said witness. *Held*, that such practice was correct, but the omission of the trial court to charge the jury that such impeaching testimony could only be considered as affecting the credibility of the witness was error.

Appeal from the District Court of Cooke. Tried below before the Hon. F. E. Piner.

The indictment in this case charged the appellant with the murder of John Ware, in Cooke county, Texas, on the second day of September, 1887. The trial resulted in the conviction of the appellant for manslaughter, and the penalty was affixed at a term of five years in the penitentiary.

M. L. Herrod was the first witness for the State. He testified

that he lived in Grayson county, between twelve and thirteen miles from the city of Gainesville, which city was in Cooke county, Texas. He knew the defendant, R. A. Williams, who was generally known as Albert Williams. He also knew John Ware, who died on the second day of September, 1887, in Cooke county, Texas, about six miles east of Gainesville. Witness and Ware went together to the town of Gainesville on the said second day of September, 1887, arriving in the town between ten and eleven o'clock. They went on horseback. Witness saw the defendant in Gainesville a number of times during the day, but was with him but little. Elbert Jarman was with the defendant at the public well in town. Witness and Ware started home from Gainesville about an hour before sunset, leaving defendant and Jarman in town, but were overtaken by them at Whaley's bridge. Witness and Ware had then stopped, and witness saw defendant and Jarman when they got within twenty-five yards of him and Ware. They were then riding slowly. Defendant and Jarman stopped when they reached witness and Ware, and all parties took three or four drinks each of diluted alcohol. After about five minutes the party left the bridge together, traveling east over the Gainesville and McComb road. . Defendant rode a pony part of the way, and exchanged it to Jarman for a mule which he rode part of the way, transferring his saddle from the pony to the mule. He and Jarman had each a pony besides the animals they were riding, Jarman's being a horse, and the defendant's a mare. Just after passing a certain school house about a mile and a half from Gainesville, the witness and defendant got into a quarrel about a pony. While in town defendant told witness that he traded a pony off to a party in town, and that, when the party saw the pony's foot, he paid him, defendant, two dollars and a half and made him trade back. On the way home he spoke of that transaction as occurring in Woodbine, and, when witness reminded him that he had before said it occurred in Gainesville, he became angry, got to "cutting up," and ran around and about witness, apparently intending to pull witness from his horse. Witness could remember nothing said by the defendant at that time, but was of the impression that defendant cursed him and said something about fighting. Ware interposed and told defendant to ride on. Up to that time the witness and defendant were riding together in front of Ware and Jarman. Witness dropped behind, and Ware and Jarman tried to get him to ride on in advance, which the witness declined to do. Ware

then joined defendant and they rode on together, Ware telling defendant that he could not impose upon nor run over the witness in his presence. Defendant weighed about one hundred and twenty pounds, and the witness then weighed eighty-five pounds.

The parties, in the order named, rode on to a point about a mile distant from where witness and defendant had the dispute, when Ware and defendant dismounted from their horses. Ware said something to the defendant which witness did not understand. Defendant replied: "You can't do it." Witness and Jarman then rode up and dismounted, and each of the four parties took a drink of whisky. Ware and defendant then began shoving each other in an angry manner, Ware using both hands and defendant his left hand, with his right hand behind him. Jarman and witness got between them and pushed them apart. Witness could remember nothing said by Ware or defendant while they were shoving each other. After they were separated, Ware said that defendant had a knife; that he (Ware) had no weapon and could be searched, but that he was not afraid of defendant's knife. Witness saw no knife. Jarman told defendant to put up his knife, and said to him: "Fight a fair fight if you are going to fight at all." Defendant made no reply to Jarman, but got on his mule, and Ware, speaking to the witness and defendant, said that he could whip the latter. Defendant replied to the effect that Ware was a "God d—d liar," and got off his mule, which was standing near the road. Witness and Jarman were then standing between Ware and defendant, and tried to keep between them, and to keep them apart as they advanced upon each other. Ware, however, shoved the witness down, and he and defendant came together near where Jarman was standing. Just as the witness was getting on his feet he saw the defendant strike a blow at Ware's left side with his right hand, after which the defendant ran, and continued to run for about thirty feet. Ware, at the time that witness saw defendant strike at him, was either trying to strike defendant or was trying to prevent the defendant from striking him—witness could not tell which. Witness heard nothing said by either party when defendant struck the blow at Ware. When defendant fled, Ware threw a bottle at him, and then seized a club and pursued him about thirty feet. He then turned and came back to where witness and Jarman were standing, said that he was stabbed to the hollow, and was dead, and asked: "Why did you let him do it?"

and fell.  At the time of the stabbing the defendant and Ware were about twenty-five feet distant from the mule from which defendant had dismounted.  During the time that he and Ware were advancing upon each other, and trying to get together, the defendant held his right hand behind him.  Defendant did not return to Ware after he fell, nor did witness see him on that evening after he fled from the scene of the stabbing.  He said nothing after the stabbing that the witness heard.  Ware fell on his left side and said nothing more than as above stated by the witness.  When he came back from his pursuit of defendant and made the statement above set out, Ware pulled up his vest.  Jarman asked if he was hurt; but he fell without replying.  Witness then mounted his horse and went to the house of Ware's mother.  When he returned he found that the saddle had been taken from the mule which was ridden by defendant just before the fight.  Witness could not now say that when Ware spoke of defendant having the knife it was just after the first quarrel between them, or whether it was when defendant got off his mule just before the fatal fight.  While in town on that day defendant showed the witness a white handled knife with a long, narrow blade, for which he said he had that day traded.  If Ware had anything in his hand until he seized the bottle after he was stabbed, the witness did not see it.  Ware was between nineteen and twenty years old, and was not as large as the defendant.  He was not dead when witness left him to go to his mother's, but was dead when witness returned.  Ware was not wearing a coat at the time he was stabbed.  He opened his vest as he came back from his pursuit of defendant; and witness saw the blood which was flowing from his wound.  Witness was drinking considerably on the fatal evening, but could not be said to be drunk.  The other boys, Jarman, defendant and Ware had drunk about as much as he, and were in about the same condition.

Cross examined, the witness said that he and John Ware were good friends.  Ware and defendant, when the former said that he could whip the latter, and the latter retorted that the former was a "God d—d liar," were about twenty-five feet distant from witness.  When Jarman went to defendant to get him to put up his knife, the defendant was about ten feet from the witness.  Witness could not now remember what, if any, was the reply Ware made to defendant when he called him a "God d—d liar."  The witness and defendant rode together for some distance after the party left Whaley's bridge.  Ware's dog was with the party,

but witness had no recollection of seeing any other dog on his way home; nor did he recollect anything about a dog fight; nor did he recollect calling to Ware to draw his pistol and shoot a dog which jumped on his dog. If anybody hissed or encouraged Ware's dog to attack another dog on the road, the witness did not remember it. It was possible that all of these things might have happened, and the witness been too drunk to remember them. No man hallooed at the party while on the road; and witness did not ride up to Ware and advise him to shoot off his pistol to get the man to stop hallooing, and Ware did not decline to do so on the ground that he did not want to discharge his pistol in a crowd. Witness could not now tell how many drinks the party took after leaving the bridge, nor between the school house and the place of the difficulty. Witness took no drink before leaving town, and he and Ware had each taken one drink, and only one, when they were overtaken by the defendant and Jarman. Witness paid for the alcohol which the party had drank. The first angry words that passed between defendant and Ware were those spoken just after the witness, having quarreled with defendant, dropped back with Jarman, and Ware joined defendant in front. Witness did not hear what, if anything, was said by defendant in reply to Ware when the latter said that defendant could not impose upon witness in his presence. No one but the parties named were present when Ware and defendant dismounted to fight. A wagon passed along the road soon afterwards. Witness did not hear the boys say that their purpose in dismounting was to fight, but he supposed that to be their object. The first thing the parties did after getting down was to take a drink. Witness got down to urinate. He could not now remember how many drinks the several parties took. His recollection was that Jarman proposed the drinks and passed him the bottle. Witness was the last of the four to drink, and could not remember who passed the bottle to Jarman before Jarman passed it to him. All that witness could remember was that a fight between Ware and defendant came up; that he and Jarman got between them, and that Ware pushed him aside, and defendant and Ware then came together. Ware did not throw the witness any distance, but pushed him aside or behind him. Witness could not tell whether Ware was striking to hit the defendant or was trying to prevent the defendant from hurting him. Ware was then between witness and defendant. Witness did not hear the defendant tell Ware that he did not want to

fight.   Both witness and Jarman attempted to prevent the defendant and Ware from fighting.   Witness supposed that the fight between Ware and defendant was brought about by the quarrel between him and the defendant, but he did not remember that, in his efforts to prevent the fight, he said anything about his quarrel with defendant.   Witness had talked to Mr. Macky about this case.   John Anderson was standing by during the conversation between witness and Macky.   Witness did not know Bill Hopkins.   Ware used both hands in pushing defendant, but defendant, in pushing Ware, used only his left hand.   The pushing continued but a short time, neither getting the advantage of the other.   Witness was now referring to the first quarrel between Ware and defendant.   As soon as the first quarrel between Ware and defendant was stopped, defendant got back on his mule.   Witness thought that he said something to Bud Ware about this matter on the night of the fatal day, but had not talked to Spence Ware about it.   Witness never saw Ware in possession of a pistol, and if he owned one the witness did not know it.   There were no arms of any kind to be seen on Ware's person after he fell.   Witness was seventeen years old.   Witness did not, on the fatal day, at any time or place, see Ware with a pistol, nor did he in any manner intimate that Ware had a pistol, nor did he hear Ware or anybody else intimate or say that such was the case.   Witness did not hear defendant make any reply to Jarman when the latter told him to put up his knife.   Witness did not know whether or not defendant put up his knife when he got back on his mule.   Witness was positive that he never told either Percy Darwin, North Edwards or Ed. Clements, in Whitesboro, that he asked Ware, while riding along the road, to shoot off his pistol in order to silence a man who was hollooing.

E. M. Jarman was the next witness for the State.   He testified that he lived about four and a half miles south of Whitesboro, in Grayson county, Texas.   Witness and defendant were neighbors, and had been acquaintances for more than twelve years.   Witness was in Gainesville, Cooke county, Texas, on Friday, September 2, 1887, having gone there from his father's house on the day before.   Defendant went to Gainesville with the witness, whose purpose in visiting Gainesville was to trade horses.   Defendant went to Gainesville on a like mission, and also to ride a wild mule belonging to the witness's father.   Witness and defendant were not partners, nor did witness ever tell

anybody that they were partners. Witness and defendant reached Gainesville about two o'clock p. m., on Thursday, and took their lodging at the Chickasaw restaurant. They went about Gainesville, witness drinking somewhat, until late in the evening of the next day, when they started home. Witness had a bay horse, and the defendant a mare pony and a mule. Defendant during the day showed the witness a keen bladed, white handled knife, which he said he got from a trader in town. Witness did not see a knife in possession of the defendant prior to that day. He borrowed one or two dollars from witness. When witness and defendant left Gainesville on Friday evening witness rode his bay horse, and defendant rode either the mule or his pony mare. They overtook Ware and Herrod at the bridge, about a mile and a half east from Gainesville. Witness drank a quantity in town and after he left town. Each of the four companions took three or four drinks at the bridge. When witness and defendant reached the bridge they observed Ware and Herrod at a spring, trying to empty some alcohol from a broken bottle into another bottle. They hailed witness and defendant, who stopped until they joined them. The entire party then sat down and laughed and chatted about ten minutes before resuming their journey in company. Witness must have been quite drunk when they left the bridge, as he could not remember the next thing that occurred. Finally, however, defendant and Herrod got into a fuss. The next thing the witness realized, he was down on the ground between defendant and Ware, trying to keep them from fighting. That was at the place of the killing. Witness could not remember getting off his horse, but could remember getting between defendant and Ware, and pushing one of the parties one way and the other the other way. While witness was trying to keep the boys apart, Lee Herrod ran up and Ware pushed him down. Ware then ran around witness and struck defendant, who struck in return. Witness saw nothing in the defendant's hands. He struck twice, apparently at Ware's body, and ran off in a circle, followed by Ware with a club. As Ware came back to where witness and Herrod were, he pulled his vest up and said: "I am cut; I am dead!" Witness could remember nothing else said by Ware at the time he came back from his pursuit of the defendant. Witness had a kind of dreamy impression that, at one time during the quarrel, Ware said: "Boys, he has got a knife," but was too drunk to be certain that he understood Ware correctly.

After Ware fell the witness started to a house a short distance from the scene of the fight to get a light, and did not know what became of the defendant. Witness's saddle was on defendant's pony when witness started to the house. When he got back he found that his saddle had been placed on the mule, and defendant's pony and saddle were gone. Witness met two men on his way to get a light. He had no recollection of the first thing he did after the stabbing. Witness saw but two blows made by defendant at Ware's body. He did not know whether the defendant was struck in the fight or not. It was the recollection of the witness that he testified, at the inquest over Ware's body, that defendant struck at Ware's left side or body, and that he struck hard blows. Witness had no recollection of telling Doctor Frazier on the night of the inquest that when he and defendant started to Gainesville, he told defendant that if he got into a difficulty on the trip, he, witness, was going to stand by him, defendant, and that now he was going to do it.

Cross examined, the witness said that defendant fled immediately after striking the second blow. He and Ware were about five feet apart when defendant started on his flight. Witness saw no blows struck after defendant fled. Ware first spoke of being cut when he got back from his pursuit of the defendant. The club which Ware seized and carried with him in pursuit of defendant was about two feet long and about as large around as the wrist of the witness. Ware's dog was along with the party, and the witness had an impression on his mind that, after the party left the spring, something was said by somebody about tying the dog to the mule's tail. Witness could not now say whether or not he left any one with Ware's body when he went after a light. According to his recollection, two men went with him back to the body. So far as the witness knew, Ware and defendant had been friendly up to the time of the fight.

H. S. Holman testified, for the State, that, as justice of the peace of precinct number one of Cooke county, he held the inquest over the body of John Ware, between eleven and twelve o'clock on the night of September 2, 1887. He found Ware's body on the ground near the Woodbine road, about six miles east of Gainesville. He made a careful examination of the body of the deceased for weapons, but found none.

Joe Crawford testified, for the State, that he was at William Wiley's house on the evening of the fatal day. About dark, four men, riding two abreast, passed Wiley's house, and witness

heard one of the men in front say: "Just wait until we get past these wagons and I will show you whether or not I am afraid to get down." The other of the two men riding in front' replied: "If you get down you will never get up again." Witness did not know which of the two men made either of the remarks. Mr. Wiley may have been with the witness at that time.

Cross examined, the witness said he heard no other remarks than those stated. A few minutes after the parties passed Wiley's house, witness went down the road and found all four of the men on the ground, on the roadside, near a little glade of prairie, about three hundred yards distant from Wiley's house. Witness denied that he ever told G. S. McBride that the words he heard spoken as the parties passed Wiley's house were: "As soon as we get past those wagons I will do you up," and that he recognized the voice of the speaker as that of John Ware.

William Wiley testified, for the State, that he saw the four men mentioned by the witness Crawford when they passed his house, and heard one of them say to another: "When we get past those wagons I will fix you," or words to that effect. If the other party replied to that remark, the witness did not hear him. Crawford was then at witness's house. There was another party at witness's house at the time. He was a man moving from the Indian Nation to Hunt county. He had stopped at witness's house to get some corn. When he got his corn he left, and camped that night at Woodbine. Witness did not know that man's name nor his present whereabouts.

Dr. Frazier testified, for the State, that he lived at the village of Woodbine, and was a physician and surgeon. He saw the body of John Ware shortly after the killing. Ware was stabbed on the right side, in the region of the heart, with a sharp instrument of some kind. Elbert Jarman told the witness, at the inquest over the body, that, when he and defendant started to Gainesville, he told defendant that if he got into a difficulty on the trip, he (Jarman) would help him out, if he (defendant) should not be in fault.

The State rested.

G. S. McBride testified, for the defense, that a few days after the killing of Ware, he had a conversation at Proffer's house with the State's witness Crawford. In the course of that conversation, Crawford told him that he heard one of the boys in front, as the four passed Wiley's house, on the fatal night, say

to the other: "As soon as we get past these wagons I will do you up," and that he recognized the voice as the voice of John Ware. No person but witness and Crawford were present at the time of that conversation.

Ed. Clements and North Edwards, testifying for the defense, said that, in Whitesboro, on the day after the killing of Ware, they heard the State's witness Herrod say that a dog passed the party on the road from Gainesville, and that he asked Ware to shoot his pistol to scare the dog.

O. P. Rushing testified, for the defense, that he lived on the Gainesville and Woodbine road, and was at home on the fatal evening, when the four boys, including defendant and Ware, passed his house. The boys stopped on the road about two hundred yards beyond witness's house, and got after his dog. Defendant was down on the ground. Witness hallooed to the boys to let his dog alone. The boys had some little talk among themselves which witness did not hear, and they then went on.

Mrs. Williams, the defendant's mother, testified that defendant was nineteen years old, and would weigh about one hundred and ten pounds; and the defense closed.

Joe Crawford, recalled by the State, testified that he never had a conversation with McBride at Proffer's about the killing. He had never seen Ware but once, and had no acquaintance whatever with him.

It was proved by the defense that the defendant voluntarily surrendered at the county jail in Gainesville, between nine and ten o'clock on the fatal night.

The defense, in the motion for new trial, complained of the action of the trial court in permitting the State, after its own witness, Jarman, had testified to facts tending to benefit the accused, to ask the said witness if he did or not, at the inquest over the body of the deceased, tell one Doctor Frazier that on the road to Gainesville he told the defendant that if he, defendant, got into a difficulty, he, the said Jarman, would stand by him; and, after the said Jarman had answered that question in the negative, to introduce the said Frazier to swear that the said Jarman did make the said statement to him. The motion alleged that the said Jarman was examined as a witness on the examining trial of the accused, in the presence and hearing of the county attorney and of the special prosecuting counsel, C. C. Potter, and that the said counsel could not have been surprised by his testimony. To this showing the State filed the counter affidavit

of Judge C. C. Potter, to the effect that, on the examining trial
of the defendant, the witness Jarman testified, in effect, that,
just before the fatal blow was struck, the deceased ran around
him, and he (deceased) and defendant got together, and both
seemed to be striking about the same time; whereas, on this
trial the said Jarman testified that deceased ran around him and
struck the defendant, and defendant then struck him—which
change in the testimony of Jarman operated to the surprise of
counsel for the prosecution.

*R. V. Bell*, for the appellant: I submit the seventh ground of
the motion for new trial as a proposition to the court, viz: That
defendant did not have a fair and impartial trial by reason of
the action of State's counsel in taking his witness, Jarman, and
placing him on the stand, and then, by cross examination and
by contradiction destroying his credibility before the jury, and
then by argument and insinuations, to deprive defendant of any
witness to the immediate transaction. Especially would we
urge this as unfair when there are only two eye witnesses to the
transaction, all mere boys, all drinking more or less, and when
the only remaining eye witness was prejudiced against defend-
ant because of a dispute between them, which was the founda-
tion of the difficulty in which this case originated. Defendant's
counsel challenged their good faith in the matter, and defendant
also, on the motion for new trial, and no denial has ever come
from them.

Then the question is, can the State's counsel take these ad-
vantages and be allowed to reap the fruits of their own wrong,
or will the rule be made by the court that a party must show
surprise at the testimony as well as injury. But Potter says in
his affidavit he was surprised at the change in Jarman's testi-
mony, but did not ask him as to the change. Did not seek the
corrective method allowed by law; in fact, did not think or real-
ize his surprise at the time of the objection, but was so impressed
weeks afterward, when the motion for new trial came up for hear-
ing. Is there any change to justify an assault on one witness by
saying at one time, "John ran around me and struck defendant,
and defendant then struck him;" and at another thus: "John ran
around me to where defendant was, and they got together; they
both seemed to be striking about the same time?"

Can counsel be correct when they pretend to see a difference
in these statements, and yet never attempt to have their witness

reconcile the difference in his statements, never call his atten-
tion to the matter, never claim surprise when charged by oppos-
ing counsel with seeking an unfair advantage and charged with
knowing what the testimony would be and that the statements
are similar?"

The court erred in not controlling the testimony of Doctor
Frazier in its charge to the jury.   And as a proposition under
this assignment I submit that evidence introduced for the pur-
pose of impeachment, if otherwise inadmissible, should be con-
trolled by the charge, and the jury instructed as to what purpose
it was to be considered by them, and if not done, it will be pre-
sumed that it affected defendant injuriously, if excepted to at
the time.

Frazier's testimony as to what Jarman told him at the in-
quest was purely hearsay, and inadmissible, was objected to by
defendant from its very incipiency, and, after admitted, the court
was then invoked to strike it out or instruct the jury as to its
effect, which was refused, and defendant duly excepted.   Aside
from robbing defendant of the testimony of his witness, the re-
marks of Jarman were calculated to injure defendant.   They
reflected on his character as to peaceableness, which had not
been put in issue, and furnished the jury with an insinuation
that he was given to broils and trouble.   Anything that reflects
upon a defendant in any manner, especially in a case like the
present, where it was doubtful who was the real assailant,
would influence the jury; besides, the verdict shows it was a
compromise between murder and manslaughter, and the highest
punishment for manslaughter was agreed upon.   The evidence,
together with the charge as to defendant preparing a knife, and
the argument of State counsel, as shown by the motion for new
trial, must have led some of the jury to believe there was evi-
dence of an understanding between defendant and Jarman, and
defendant had prepared for the difficulty by obtaining the knife.
(Marshall v. The State, 5 Texas Ct. App., 291; Preston v. The
State, 4 Texas Ct. App., 186; McKnight v. The State, 6 Texas Ct.
App., 158; Somerville v. The State, 6 Texas Ct. App., 437; Long
v. The State, 13 Texas Ct. App., 212; McWilliams v. The State,
44 Texas, 118; Henderson v. The State, 1 Texas Ct. App., 437;
Tyler v. The State, 13 Texas Ct. App., 209; White v. The State,
10 Texas Ct. App., 381; Moody v. The State, 6 S. W. Rep.)

*Gresham, Jones & Spencer*, also for appellant:   This cause

should be reversed for the error of the court in · requiring the State's witness Jarman to answer, over the objection of appellant, the following questions : "Did you not tell Doctor Frazier, on the night of the inquest, that you told defendant, when you started to Gainesville, that, if he got into any difficulty on the trip, you would stand by him, and that you were now going to do it ?"

1. Because the State was not surprised by anything the witness testified to on the trial.

2. The witness stated no fact injurious to the State. (Tyler v. The State, 13 Texas Ct. App., 205; Thomas v. The State, 14 Texas Ct. App., 70.)

3. The witness should not have been examined on collateral and irrevelant matter with a view to subsequently contradict him by calling another witness. (Bute v. The State, 10 Texas Ct. App., 368; White v. The State, 10 Texas Ct. App., 381; Rainey v. The State, 20 Texas Ct. App., 485.)

4. Because this evidence was admitted for the sole purpose of impeaching the witness, and the court erred fatally in not charging the jury that they consider it for no other purpose. (Branch v. The State, 15 Texas Ct. App., 102; Washington v. The State, 17 Texas Ct. App., 197.)

5. Because the question and answer were greatly calculated to injure the defendant, who was not present at the time these words are charged to have been spoken. All of these objections apply with equal force to the question to and answer of Doctor Frazier.

The sixteenth clause of the charge is fatally defective in that it raises the penalty for manslaughter to not less than three years nor more than five years. (Jones v. The State, 7 Texas Ct. App., 338; Rodriguez v. The State, 8 Texas Ct. App., 129; Spears v. The State, 8 Texas Ct. App., 467; Bouldin v. The State, 8 Texas Ct. App., 624; Wilson v. The State, 14 Texas Ct. App., 527.)

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. There is a fundamental error in the charge of the court with respect to the penalty for manslaughter. It states the minimum punishment to be confinement in the penitentiary for *three years*, when the law fixes it at *two years*. (Penal Code, art. 604.) The error is confessed by the Assistant

Attorney General, and because of such error the conviction must be set aside. (Wilson v. The State, 14 Texas Ct. App., 527; Bostic v. The State, 22 Texas Ct. App., 136, and other cases therein cited.)

Several objections to the charge of the court upon murder in the first and second degrees have been presented and urged by counsel for defendant, which we decline to consider and determine because not necessary to a disposition of the case, and because the law 'of murder has been eliminated from the case by the conviction of a lower grade of homicide.

With respect to the charge of the court upon the issue of the intoxication of the defendant, it follows substantially the language of the statute, and is not materially different from charges heretofore approved by this court. (Willson's Texas Crim. Laws, secs. 92, 94.) The statute referred to is awkwardly worded, and its meaning in some respects is not very clear. As we construe it, it means that intoxication, or temporary insanity produced by the voluntary, recent use of ardent spirits will not excuse crime, or necessarily mitigate the penalty prescribed by law for the crime. But such state of mind may be proved, and when proved, may be considered by the jury, in mitigation of the prescribed punishment.

In a case where the charge is murder, such state of mind may be considered by the jury in determining the degree of the homicide, and also in mitigation of the penalty of any degree of homicide of which the defendant may be found guilty. Such we believe to be the meaning of the statute, though the language used does not directly and clearly apply the provision as to mitigation of the penalty to a case of homicide, nor to degrees of homicide other than murder in the first and second degrees.

But the charge of the court, as far as it instructed upon the issue of intoxication, was correct. It was not excepted to, and no additional instruction was requested. In the motion for a new trial the attention of the court was called to this particular portion of the charge, but only in a general way, without specifying in what respect it was defective, except that it was not full enough. Conceding that the law upon the issue of intoxication was not fully charged, we are of the opinion, in view of the evidence, that the error is immaterial, not being of a character calculated to injure the rights of the defendant.

Evidence was offered by the State for the purpose of impeaching one of its own witnesses, who had testified favorably to the

defendant, and such impeaching evidence was admitted over the objection of the defendant. It was not error, we think, to admit such test'mony, as the witness had testified to some facts which were injurious to the State. But it was error to omit to instruct the jury that such testimony should not be considered by them for any other purpose than that of affecting the credibility of said witness. (Tyler v. The State, 13 Texas Ct. App., 205; Branch v. The State, 15 Texas Ct. App., 96; Washington v. The State, 17 Texas Ct. App., 197.)

Errors are complained of, by the defendant, in the charges upon manslaughter and self defense. There are no exceptions to these charges in the record. When considered with reference to the evidence before us, we find no material error in said charges. In all respects, except those hereinbefore specified, the charge is, in our opinion, sufficient and correct, and as favorable to the defendant as the facts would warrant.

Because of the error in the charge, with reference to the penalty for manslaughter, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 25, 1888.